# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRIONN STOKES,
        Plaintiff,

     v.                                             Case No. 07-C-0865

AMERICAN CYANAMID, et al.,
        Defendants.

## DECISION AND ORDER

### I. BACKGROUND

Plaintiff Brionn Stokes, a minor, brought this personal injury action in state court seeking damages resulting from his exposure to white lead carbonate pigment, a kind of lead paint. Plaintiff named as defendants a number of entities including companies which formerly manufactured lead paint. Defendants removed the action based on diversity of citizenship. Before me now is a motion by defendant Sherwin-Williams Co. ("Sherwin"), asking me to disqualify myself based on a law review article that I co-authored with a former law clerk, Shelley Fite. The article in question was entitled, Exercising Judicial Power, A Response to the Wisconsin Supreme Court's Critics, and it can be found at 91 Marquette Law Review 425 (2007).

Ms. Fite and I wrote the article in order to respond to three previously published articles criticizing the Wisconsin Supreme Court for exceeding what the authors regarded as its proper role. One of the articles to which we responded was written by Diane Sykes, a judge on the United States Court of Appeals for the Seventh Circuit and a former member of the Wisconsin Supreme Court. Judge Sykes's article was based on her March

7, 2006 Hallows Lecture at Marquette University Law School and entitled Reflections on the Wisconsin Supreme Court. It can be found at 89 Marquette Law Review 723 (2006). A second article was written by then-Milwaukee County Circuit Court Judge Michael B. Brennan and entitled Are Courts Becoming Too Activist? It appeared in the Milwaukee Journal-Sentinel (Oct. 2, 2005 at 1J). The third article was a Federalist Society White Paper written by Milwaukee lawyer Rick Esenberg and entitled: A Court Unbound? The Recent Jurisprudence of the Wisconsin Supreme Court (Available at http://fed-soc.org/doclib/20070329WisconsinWhitePaper.pdf).

The three critical articles focused on five of the court's decisions: State v. Knapp, 287 Wis. 2d 86 (2005), State v. DuBose, 285 Wis. 2d 143 (2005), In re Jerrell C.J., 283 Wis. 2d 145 (2005), Ferdon v. Wisconsin Patients Compensation Fund, 284 Wis. 2d 573 (2005), and Thomas v. Mallet, 285 Wis. 2d 236 (2005). Three of these decisions, Knapp, DeBose, and Jerrell, involved criminal procedure, and two, Ferdon and Thomas, involved tort law. The theme of the critical articles was that the court had "depart[ed] from . . . familiar and long accepted constraints on its power." Sykes, supra, at 725-26. As Judge Brennan put it, the decisions raised questions "about the proper exercise of judicial authority under the state's constitution and laws." Brennan, supra, at 1J. The critics' position was that the court should play a narrow role in public life, should not make policy, attempt to ameliorate social problems or establish new rules, and that the decisions in question violated one or more of these precepts.

Ms. Fite and I responded to the articles because we believed that the role that the critics assigned to the court was too narrow and because we considered it important for someone to "provide a different point of view." Adelman & Fite, supra, at 428. We were

2

concerned that no Wisconsin judge, lawyer or legal academic had done so. In our response, we argued that the Wisconsin Constitution envisioned a broader role for the court than that which the critics advocated and that contrary to the critics, the court need not always defer to the political branches of government, adhere to its own precedent and fashion the narrowest possible remedy. We expressly took no position on the merits of any of the five decisions to which the critics objected. Id. at 428, 445. Rather, we summarized their facts and holdings and discussed the critics' objections. We focused on disputing the critics' notion that the five decisions involved an unauthorized and/or improper exercise of judicial power. We concluded by stating that in some respects, the decisions involved "positive legal developments." Id. at 445.

In one of the decisions that the critics found objectionable, Thomas, the Wisconsin Supreme Court held that plaintiffs allegedly damaged by their contact with lead paint could attempt to establish liability under the risk contribution theory that the court had announced in Collins v. Eli Lilly Co., 116 Wis. 2d 166 (1984). Under such theory, depending on the facts, a plaintiff may be able to recover against a manufacturer of a product which allegedly harmed him even if he cannot establish that a specific manufacturer produced the injurious product. The principal dispute in Thomas was whether Article I, section 9 of the Wisconsin Constitution, which specifies that injured parties are entitled to a "remedy," authorized the court to apply the risk-contribution theory in the lead paint context. The court held that it did and specified what a plaintiff in a lead paint case would have to prove to recover under the theory. Because the parties disputed numerous facts, the court remanded the case for trial. The court also declined to address the defendants' constitutional arguments

against the imposition of liability, stating that the record was insufficiently developed to resolve them.

Out of a twenty-seven page article, Ms. Fite and I devoted only a few paragraphs to <u>Thomas</u>, and our discussion of it consisted almost entirely of a summary of the facts, the holding and the critics' objections. The discussion is as follows:

> The court faced a minor plaintiff with serious disabilities allegedly caused by white lead carbonate pigment, a kind of lead paint. The plaintiff alleged that homes in which he lived contained lead paint applied sometime between 1900 and the 1970s. However, he could not identify the brand of paint applied in each home. The court examined whether the plaintiff could sue one or more lead paint manufacturers under the risk-contribution theory. The court first concluded that lead paint constituted a serious public health hazard and that lead paint manufacturers had downplayed the product's risks and continued to market the product long after they knew of such risks. It then discussed the risk-contribution theory of liability, first recognized in 1984 in <u>Collins v. Eli Lilly Co</u>. In <u>Collins</u>, the plaintiff suffered injury as a result of exposure to a drug (DES) while in utero but could not identify the drug's manufacturer. The court found that the plaintiff could recover against any DES manufacturer under either a negligence or strict liability theory by showing that such manufacturer contributed to a public risk that caused her injury. It found this modification of existing common law equitable because all DES manufacturers created a public health risk and could pay for injuries more easily than the plaintiff; also, requiring them to do so would encourage manufacturers to more adequately test drugs before marketing them. Under the risk-contribution theory, each individual manufacturer could defend by showing that it could not have caused the plaintiff's injury because it did not produce or market DES either during the exposure period or in the relevant geographic area.
>
> The <u>Thomas</u> defendants first argued against applying the risk-contribution theory on the ground that the <u>Collins</u> court fashioned the theory pursuant to the state constitution's remedy clause and not as an ordinary common law development. Because the <u>Thomas</u> plaintiff could sue his landlords, they argued that the remedy clause did not apply. Second, the defendants argued that <u>Collins</u> did not govern because the risk of lead paint differed from that of DES. Finally, the defendants argued that the court could not constitutionally apply <u>Collins</u> to them. The court rejected the defendants' first two arguments and declined to decide their constitutional argument prior to trial. Two justices dissented, arguing that lead poisoning differed from the

4

> DES injury and that the decision expanded tort liability disproportionately to culpability.
>
> > The critics agreed with the dissenters. Judge Brennan said that Thomas exhibited his third indicator of activism--a broad holding. Judge Sykes criticized the decision, stating that it would likely harm Wisconsin's economy and that the defendants would be unable to defend against the claims. She conceded that common law "is all about judicial policy judgments," but argued that it "develops best when developed incrementally." [Milwaukee attorney Rick] Esenberg expressed concern about the decision's discussion of the state constitution's right to a remedy.

Adelman & Fite, supra, at 434-36.

Later in the article, we added the following comment:

> [i]n Thomas, the court examined a case in which each of the defendants manufactured a product that (the court assumed, for summary judgment purposes) injured a wholly innocent plaintiff. The facts raised the possibility that the innocent plaintiff would be left with no compensation from the industry that actually harmed him. Thus, in. . . Thomas, the court ensured that the doors of the courthouse remained open.

Id. at 446.

The Adelman/Fite article did not mention or discuss the present case or any case pending in any court. It also did not take a position on any issue raised by the present case.

## II. DISCUSSION

**A.    Applicable Legal Principles**

A federal judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  Recusal is required when a "reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits." In re United States of America, 572 F.3d 301, 308 (7th Cir. 2009) (quoting In re Mason, 916 F.2d 384, 385 (7th Cir. 1990)).  The question is whether

5

a well-informed observer could reasonably question the judge's impartiality. Id. at 310

(citing In re Hatcher, 150 F.3d 631, 637 (7th Cir. 1998)). The standard is an objective one.

Hook v. McDade, 89 F.3d 350, 353-54 (7th Cir. 1996). The inquiry is based on what a well-

informed, thoughtful observer would perceive because

> a thoughtful observer understands that putting disqualification in the hands of a party whose real fear may be that the judge will apply the law rather than disregard the law could introduce a bias into adjudication. Thus, the search is for a risk substantially out of the ordinary.

In re Mason, 916 F.2d at 385-86. As Justice Kennedy put it,

> [section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

Liteky v. United States, 510 U.S. 540, 557-58 (1994) (Kennedy, J. concurring).

"[A] judge's view of the law acquired in scholarly reading" is not a basis for recusal.

Liteky, 510 U.S. at 554. Further, the fact that a judge has expressed views on a legal

subject is not a ground for disqualification. Rosquist v. Soo Line R.R., 692 F.2d 1107,

1112 (7th Cir. 1982) (stating that the fact that the judge had written and spoken on the

subject of contingent fees did not require his recusal from a case in which he had to

determine an attorney's fee); see also United States v. Wilkerson, 208 F.3d 794, 797 (9th

Cir. 2000) (stating that "[a] judge's views on legal issues may not serve as the basis for

motions to disqualify") (quoting United States v. Conforte, 624 F.2d 869, 882 (9th Cir.

1980)); United States v. Bauer, 84 F.3d 1549, 1560 (9th Cir. 1996) (stating that a judge's

6

statements to a newspaper indicating a view that marijuana distribution was a serious and pervasive social problem did not require recusal because a judge's view on a legal issue could not serve as ground for disqualification).

Because "needless recusals exact a significant toll," In re United States, 572 F.3d at 308, a "district judge is . . . obligated not to recuse himself without reason, just as he is obligated to recuse himself when there is reason." N.Y. City Dev. Corp. v. Hart, 796 F.2d 976, 981 (7th Cir. 1986) (quoting Suson v. Zenith Radio Corp., 763 F.2d 304, 308-09 n.2 (7th Cir. 1985)). "Automatic disqualification allows the party to manipulate the identity of the decisionmaker and may be no more healthy for the judicial system than the denial of a borderline motion." Id.

The goals sought to be served by the Canons in the Code of Judicial Conduct inform the recusal analysis but are not necessarily dispositive. In re Boston's Children First, 244 F.3d 164, 168 (1st Cir. 2001). Canon 4(A) authorizes judges to "speak, write . . . and participate in . . . law-related activities." And the Commentary to Canon 4(A) provides that as a "person specially learned in the law, a judge is in a unique position to contribute to the improvement of the law . . . ." Further, in Advisory Opinion No. 93, the Committee on Codes of Conduct states that "Judicial scholarship is particularly encouraged by Canon 4 . . . . The evolution and exposition of the law is at the core of a judge's role. Judges, therefore, have the ability to make a unique contribution to academic activities such as teaching and scholarly writing, which similarly serve to advance the law . . . ." Canon 3(A)(6) instructs judges to "avoid public comment on the merits of a pending or impending action." However, such proscription does not apply "to a scholarly presentation made for purposes of legal education."

7

### B. Application to Present Case

I conclude that although a well-informed reader of the Adelman/Fite article could conclude that I held certain views about the criticism directed at the Wisconsin Supreme Court, no such reader could reasonably conclude that there is a significant risk that I would resolve the present case other than on the merits. I reach this conclusion for several reasons. First the article did not mention or discuss the present case or any other pending case[1]. Second, the article did not take a position on any issue raised by in the present case. Third, the article took no position on the merits of Thomas. Fourth, even if the article had taken a position on Thomas, that fact would not be a basis for disqualification. This is so because a judge's view of the law does not provide a basis for disqualification. Liteky, 510 U.S. at 554; Rosquist, 692 F.2d at 1112; Wilkerson, 208 F.3d at 797. Finally, even if a judge's view of the law could be a basis for disqualification and a well-informed observer could reasonably conclude that I held a view of Thomas, no well-informed observer could reasonably conclude that such view might affect my resolution of the present case. This is so because the present case is a diversity case, and to the extent that Thomas might be applicable, I would be obliged to apply it regardless of my view of it.

---

[1] Because the article did not mention or discuss the present case or any other pending case, its publication did not violate Canon 3(A)(6) of the Code of Judicial Conduct. Further, to the limited extent that the article commented on Thomas, its comments cannot be reasonably regarded as comments on the present case. This is so because the issues in the present case are different from those that the Wisconsin Supreme Court addressed in Thomas (if the issues were the same, Thomas's resolution of them would be binding in the present case because it is a diversity case governed by Wisconsin law). Finally, even if the article's comments on Thomas could be reasonably regarded as comments on the present case, such comments did not violate Canon 3(A)(6) because the article was a scholarly presentation made for purposes of legal education.

8

In its main brief, Sherwin lists "several impressions of the authors' views" that the article might provide. (Def.'s Mem. in Supp. of Mot. to Disqualify at 3.) The views that Sherwin lists are "the Wisconsin Supreme Court decided Thomas correctly," that defendant's "constitutional defenses" are without merit, that "the former manufacturers are culpable," that "[d]efendants and 'the industry' caused harm to plaintiff," that "[t]he plaintiff's alleged injuries have no other explanation and plaintiff deserves a remedy," that "risk contribution theory definitely applies to white lead carbonate pigments," and that "the authors favor the 'positive legal development' of applying risk contribution theory to white lead carbonate pigments over the 'business interests' [seeking] to overturn or limit . . . Thomas." (Id.) However, even assuming that a judge's view of the law could provide a basis for disqualification, the article did not discuss or endorse any of these views. Thus, no well-informed reader of the article could reasonably conclude that I held them.

Sherwin then cites United States v. Cooley, 1 F.3d 985 (10th Cir. 1993) and In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001) in support of its motion to disqualify. In Cooley, a judge, presiding over criminal and civil cases involving protesters blocking access to abortion clinics, appeared on a widely viewed national television program and expressed his determination to prevent the protesters from closing the clinics by illegal means. The Tenth Circuit held that this act required disqualification because the judge's conveyance of his resolve to see his order in a pending matter enforced, together with his appearance on national television at a sensitive time, created the appearance that he had become an active participant in the case instead of a detached adjudicator. Cooley, 1 F.3d at 995. In In re Boston's Children First, which dealt with whether the assignment of Boston elementary school students was racially discriminatory, the presiding judge wrote a letter

9

to the Boston Herald, correcting what she viewed as inaccuracies in an article about the case and subsequently commented on the case in a published interview with the Herald. The First Circuit held that the judge's comments to the media required disqualification because "in newsworthy cases where tensions may be high, judges should be particularly cautious about commenting about pending litigation." 244 F.3d at 169, 170. The present case is not remotely similar to Cooley or Boston's Children First. I neither appeared on television nor granted a newspaper interview. I co-authored a law review article, an act of judicial scholarship strongly encouraged by the Code of Judicial Conduct. And the law review article did not discuss a pending case.

Sherwin nevertheless contends that the fact that I put time and effort into co-authoring the article "might well suggest to a reasonable observer" that I might decide the present case other than on the merits. (Def.'s Reply Br. in Supp. of Mot. to Disqualify at 2.) But, as discussed, the article was not about lead paint cases, discussed Thomas only briefly, expressly declined to take a position on it, and said nothing about the present case or any issue presented by it. Thus, even assuming that a judge's legal views could be a basis for disqualification, no well-informed reader of the article could reasonably perceive that there was a significant risk that I would decide the present case other than on the merits. Moreover, if embraced by courts, Sherwin's argument would significantly undermine Canon 4(A), which encourages judicial scholarship. A number of judges publish law review articles frequently. In the last few years, in addition to the article Sherwin cites,

10

I have published articles on habeas corpus,[2] federal sentencing,[3] and constitutional law.[4] If the fact that judges put time and effort into writing articles raised questions about whether they could fairly adjudicate cases raising issues touched on by the articles, judges would face a multitude of recusal motions. Such a result is surely not what the law of recusal contemplates.

Therefore, for the reasons stated,

**IT IS ORDERED** that Sherwin's motion to disqualify is **DENIED**.

Dated at Milwaukee, Wisconsin, this 16 day of February, 2009.

/s_____
LYNN ADELMAN
District Judge

---

[2] Lynn Adelman, The Great Writ Diminished, 35 New Eng. J. on Crim. & Civ. Confinement 1 (2009).

[3] Lynn Adelman & Jon Deitrich, Improving the Guidelines through Critical Evaluation: An Important New Role for District Courts, 57 Drake L. Rev. 575 (Spring 2009); and Lynn Adelman & Jon Deitrich, Marvin Frankel's Mistakes & the Need to Rethink Federal Sentencing, 13 Berkeley J. Crim. L. 239 (2008),

[4] Lynn Adelman & Jon Deitrich, Saying What The Law Is: How Certain Legal Doctrines Impede The Development of Constitutional Law & What Courts Can Do About It, 2 Fed. Courts L. Rev. 87 (2007).

11